IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHELLY LEMIRE, individually and as a personal representative for the ESTATE OF ROBERT ST. JOVITE, GERARD CHARLES ST. JOVITE, and NICOLE ST. JOVITE,<br><br>Plaintiffs,<br><br>v.<br><br>ARNOLD SCHWARZENEGGER, CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION, JAMES E. TILTON, TOM L. CAREY, D.K. SISTO, REBECCA CAHOON, ALFREDO ALCARAZ, RAYMOND WADE, CHERYL ORRICK, GALE MARTINEZ, GORDON WONG, JAMES NUEHRING, SHABREEN HAK, ALVARADO TRAQUINA, ALFREDO NORIEGA, JOHN M. DUSAY, C. HOLLIDAY, JAIME CHUA, DODIE HICKS,<br><br>Defendants. | 2:08-cv-00455-GEB-EFB<br><br><u>ORDER GRANTING EACH DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING EACH PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u> |

Each Defendant moves for summary judgment on the remaining Eighth and Fourteenth Amendment claims alleged in this action under 42 U.S.C. § 1983. Alternatively, certain Defendants seek summary judgment on his or her qualified immunity defense to these claims. Further, the Estate Plaintiff moves for summary judgment on the Eighth Amendment claims against Defendants James Nuehring and D.K. Sisto, and the individual Plaintiffs move for summary judgment on the Fourteenth Amendment claims against these same defendants. Each claim concerns the

1

death of Robert St. Jovite ("St. Jovite"), who was an inmate at California State Prison at Solano ("CSP-Solano") when he died.

## I. Legal Standard

A party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If this burden is satisfied, "the non-moving party must set forth, by affidavit or as otherwise provided in [Federal] Rule [of Civil Procedure] 56, specific facts showing that there is a genuine issue for trial." T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (internal quotations marks omitted) (emphasis omitted). This requires that the non-moving party "come forward with facts, and not allegations, [that] controvert the moving party's case." Town House, Inc. v. Paulino, 381 F.2d 811, 814 (9th Cir. 1967). All reasonable inferences that can be drawn from the evidence "must be drawn in favor of the non-moving party." Bryan v. McPherson, 608 F.3d 614, 619 (9th Cir. 2010). When deciding cross-motions for summary judgment, each motion is evaluated on its own merits, "taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." B.F. Goodrich Co. v. U.S. Filter Corp., 245 F.3d 587, 592 (6th Cir. 2001).

When the defendant is the moving party and is seeking summary judgment on one or more of the plaintiff's claims, the defendant:

> [H]as both the initial burden of production and the ultimate burden of persuasion on [the motion]. In order to carry its burden of production, the [defendant] must either produce evidence negating an essential element of the [plaintiff's claim] or show that the [plaintiff] does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial.

2

Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc., 210 F.3d 1099, 1102 (9th Cir. 2000) (internal citations omitted).

Further, the Eastern District's Local Rule 260(b) prescribes:

> Any party opposing a motion for summary judgment or summary adjudication [must] reproduce the itemized facts in the [moving party's] Statement of Undisputed Facts and admit those facts that are undisputed and deny those that are disputed, including with each denial a citation to the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission, or other document relied upon in support of that denial.

E.D. Cal. R. 260(b). If the nonmovant does not "specifically . . . [controvert duly supported] facts identified in the [movant's] statement of undisputed facts," the nonmovant "is deemed to have admitted the validity of the facts contained in the [movant's] statement." Beard v. Banks, 548 U.S. 521, 527 (2006) (finding that a party opposing summary judgment who "fail[s] [to] specifically challenge the facts identified in the [moving party's] statement of undisputed facts . . . is deemed to have admitted the validity of [those] facts"). "Because a district court has no independent duty 'to scour the record in search of a genuine issue of triable fact,' and may 'rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment,' . . . the district court . . . [is] under no obligation to undertake a cumbersome review of the record on the [nonmoving party's] behalf." Simmons v. Navajo Cnty., Arizona, 609 F.3d 1011, 1017 (9th Cir. 2010) (quoting Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996)). The court also considers a party's evidence cited in support of a party's position on an undisputed fact where an asserted undisputed fact is controverted with specific evidence.

## II. Factual Record and Procedural History

"Robert St. Jovite entered the custody of the California Department of Corrections and Rehabilitation [("CDCR")] on June 29, 2000" and "was transferred to [CSP-Solano] in January 2002." (Defs.' Statement of Undisputed Facts ("Defs.' SUF") ¶¶ 1-2.) While housed at CSP-Solano, St. Jovite was treated by John M. Dusay, a psychiatrist at CSP-Solano, for depression, anxiety, panic attacks, and early stages of agoraphobia. Id. ¶¶ 4-19. Defendants state it is undisputed that "St. Jovite never expressed to [Dr.] Dusay any suicidal thoughts, intentions, or feelings, and [Dr.] Dusay saw no evidence of suicidal ideations [sic] when he saw St. Jovite or reviewed his medical records." Id. ¶ 20. Plaintiffs counter it is disputed whether St. Jovite expressed suicidal ideation because "St. Jovite stated that his life was becoming unmanageable as a result of his symptoms of anxiety and depression" and "[t]here is a question of fact whether or not this level of hopelessness, when combined with the other risk factors present for St. Jovite, i.e. depression, anxiety, a life sentence, rises to the level of expressed suicidal ideation." (Pls.' Response to Defs.' SUF ¶ 20.) Plaintiffs cite to an inmate appeal form as support for this argument, which St. Jovite filled out after St. Jovite last met with Dr. Dusay for treatment. St. Jovite states in the appeal form his "daily life is almost unmanageable." (Decl. of Geri Lynn Green in Supp. of Response to Defs.' Mot. for Summ. J., Ex. 16.) Plaintiffs also cite the deposition testimony of Defendant Alfredo Noriega, a doctor at CSP-Solano, as support for this argument. However, the cited portion of Dr. Noriega's testimony does not concern Dr. Dusay's treatment of St. Jovite. Rather, Dr. Noriega's referenced deposition testimony concerns the significance to him of the "three strikes" entry in a document he was shown during

4

his deposition. Dr. Noriega's pertinent testimony concerning this entry is as follows: "In our training, they teach us to look at signs of people who are about to commit suicide, and [being imprisoned for having three strikes] is one of those signs of symptoms that may precipitate inmates committing suicide." (Dep. of Alfredo Noriega 36:16-21.) Therefore, it is uncontroverted that "St. Jovite never expressed to [Dr.] Dusay any suicidal thoughts, intentions, or feelings, and [Dr.] Dusay saw no evidence of suicidal ideations [sic] when he saw St. Jovite or reviewed his medical records." (Defs.' SUF ¶ 20.) Plaintiffs dismissed Dr. Dusay as a defendant in this case during oral argument on these motions.

"On May 10, 2006, St. Jovite was housed in Building 8, cell 236 at [CSP-Solano], and John Harden [("Harden")] was his cell mate." Id. ¶ 49. "Building 8 was a climate-controlled building where general population inmates on psychotropic medications were housed." Id. ¶ 50. Defendants Rebecca Cahoon ("Cahoon") and Chris Holliday ("Holliday") "were the third-watch floor officers for Building 8 on May 10, 2006." Id. ¶ 53. Defendant Jaime Chua ("Chua") "was the third-watch control booth officer." Id. "Upon arrival for their work shift [at 2:00 p.m.], Cahoon and Holliday . . . were required to attend an emergency meeting called by [Defendant] Captain [James] Nuehring [("Nuehring")]." (Id. ¶ 54; (Pls.' Separate Statement of Undisputed Facts ("Pls.' SUF") ¶ 6.) "Chua did not attend the meeting because, as a control booth officer, he cannot leave his post . . . ." (Defs.' SUF ¶ 57.) The meeting required all floor and yard officers and supervisory staff to leave their posts, including Defendants Sergeant Cheryl Orrick ("Orrick"), Sergeant Gale Martinez ("Martinez"), and Lieutenant Gordon Wong ("Wong"). (Pls.' SUF ¶¶ 9, 10, 12.) "The meeting concerned the stabbing of an officer at

5

1 another prison, and Nuehring went over safety concerns and precautions
2 when entering a cell." (Defs.' SUF ¶ 54.)

3 The parties dispute how long the meeting called by Nuehring
4 lasted. Defendants state "[t]he meeting lasted over an hour." Id. ¶ 59.
5 Plaintiffs respond that "training records indicate the meeting was only
6 30 minutes." (Pls.' Response to Defs.' SUF ¶ 59.) However the training
7 record Plaintiffs cite does not support their position that the meeting
8 lasted only 30 minutes; instead, that training record states the meeting
9 lasted one hour. (Decl. of Geri Lynn Green in Supp. of Response to
10 Defs.' Mot. for Summ. J., Ex. 10, at 8.)

11 "Cahoon and Holliday returned to Building 8 at approximately
12 3:30 p.m." (Defs.' SUF ¶ 59.) Upon returning, Cahoon heard someone yell
13 "man down." Id. ¶ 60. "[Cahoon] could not immediately tell where the
14 voice was coming from and asked the inmate to identify the cell number."
15 Id. Cahoon and Holliday then proceeded to St. Jovite's cell. (Pls.'
16 Response to Defs.' SUF ¶ 60.) Upon arrival, Cahoon "saw inmate Harden
17 slapping St. Jovite on the head and shoulder area, and she saw St.
18 Jovite's legs and his body resting against the corner of the cell."
19 (Defs.' SUF ¶ 61.) "She also noticed that St. Jovite's head was limp on
20 his shoulder and his hands were resting on his lap. Cahoon believed that
21 Harden was hitting St. Jovite and that they were or had been fighting."
22 Id. ¶ 62. "Cahoon ordered Harden to back away and asked what happened."
23 Id. "Harden stated that he awoke to find St. Jovite hanging from the
24 grill over the sink, but Cahoon did not see [a] noose." Id. ¶ 63. Cahoon
25 "instructed Holliday to call a medical code 2. But before Holliday did,
26 Cahoon took the radio from him and called the code herself. She ordered
27 Holliday to retrieve the cut-down kit from the control both." Id. ¶ 63.
28 "Holliday went to [the] control booth to retrieve the cut-down kit." Id.

1  ¶ 64. "Cahoon did not order that the cell door be opened. She continued
2  to tell Harden to back away from St. Jovite." Id. ¶ 65.
3        "While waiting for Holliday to return, Cahoon saw medical
4  staff approach the building, and she also saw a search and escort
5  officer run in and walk up the stairs. Cahoon then signaled for Chua to
6  open the cell door." Id. ¶ 66. "When the door opened, St. Jovite's body
7  slowly rolled out so his upper body was halfway out the cell." Id. ¶ 69.
8  "St. Jovite had a sheet around his neck; his face was a purplish color;
9  he had dried mucous and spit around his mouth; and he was cold to the
10 touch." Id. ¶ 70. Holliday and Cahoon then walked inside of the cell.
11 (Pls.' Response to Defs.' SUF ¶ 67.) Cahoon ordered Harden to step out
12 of the cell, and Defendant Raymond Wade, a search and escort officer,
13 escorted Harden to the floor level. (Defs.' SUF ¶¶ 67, 72.)
14       Defendants state it is undisputed that Defendant Shabreen Hak
15 ("Hak"), a medical technical assistant at CSP-Solano, "arrived [at St.
16 Jovite's cell] as soon as the area was secured." Id. ¶¶ 68, 73.
17 Plaintiffs respond it is disputed whether Hak was present as soon as the
18 area was secured because "the time of arrival on multiple incident
19 reports was changed." (Pls.' Response to Defs.' SUF ¶ 73.) The incident
20 reports do not show that Hak's arrival time was changed; however, the
21 time the medical code 2 call was made was changed on some of the
22 incident reports. Therefore, it is uncontroverted that Hak "arrived [at
23 St. Jovite's cell] as soon as the area was secured." (Defs.' SUF ¶ 73.)
24       After Hak arrived, "Cahoon stepped aside and let Hak provide
25 medical attention." Id. "Hak checked St. Jovite's carotid pulse by
26 moving down the sheet a bit; there was no pulse. He was purplish in
27 color, and his feet were cold." Id. ¶ 76. "Blood had settled where [Hak]
28 believed [St. Jovite] had gone into rigor mortis based on her training

7

and experience." Id. Hak then applied an automated external defibrillator, "which showed a flat line." Id. ¶ 77.

Nurse Hill, a CSP-Solano nurse, arrived at St. Jovite's cell while Hak was applying the automated external defibrillator. Id. ¶ 77. "Hak stepped aside and let Hill make his own assessment because he was a registered nurse." Id. ¶ 78. The record is silent on precisely what Hill did, and Hill is not a defendant in this action. Subsequently, Defendant Dodie Hicks, a supervising nurse at CSP-Solano, arrived at St. Jovite's cell. Id. ¶ 94. Hicks testified at her deposition that when she arrived, Hak, Hill, and other officers were "standing around [St. Jovite] and nothing was being done." (Dep. of Dorothy Hicks 41:18-21.) "When [Hicks] arrived, she performed an assessment of St. Jovite. She found that he had severe bluish discoloration from the nipple line up; there was no spontaneous respirations; his pupils were fixed and dilated; and there was no carotid pulse. St. Jovite also had some slight stiffness." (Defs.' SUF ¶ 94.) "Hicks also noticed that St. Jovite had mottling, a precursor to lividity or rigor mortis, and was cyanotic, bluish discoloration caused by the lack of oxygen." Id. ¶ 95. "Based on Hicks experience and training in nursing and forensics, [Hicks] believed that St. Jovite's symptoms--dilated and fixed pupils, mottling, and cyanosis—-indicated that death was irreversible." Id. ¶ 96.

Defendant Alfredo Noriega ("Dr. Noriega"), a doctor at CSP-Solano, arrived at St. Jovite's cell "while Hicks was still assessing St. Jovite." Id. ¶ 97. "Hicks stepped away from St. Jovite and allowed [Dr.] Noriega to start assessing [St. Jovite]." Id. ¶ 98. Dr. "Noriega found that St. Jovite had lividity, mottling, and cyanosis; he was not breathing; and his pupils were dilated and nonreactive." Id. ¶ 99.

1      When Defendants Orrick, Wong, and Martinez arrived at St. Jovite's cell in response to the medical code 2 call, St. Jovite was being assessed by medical staff. Id. ¶¶ 80-81, 85, 90-92. Since each of these Defendants observed medical staff attending to St. Jovite, none of them performed Cardiopulmonary resuscitation ("CPR") on St. Jovite or ordered any correctional officer to perform CPR on St. Jovite. Id. ¶¶ 81-82, 87, 92-93. Defendant Alfredo Alcaraz, a security and investigations officer, also responded to St. Jovite's cell as an observer. Id. ¶ 88. "When [Alcaraz] arrived, he saw a couple of members of the medical staff with St. Jovite." Id.

       Paramedics from Vaca Valley Hospital arrived at St. Jovite's cell approximately 25 minutes after Cahoon made the medical code 2 summons. (Id. ¶ 103; Pls.' SUF ¶ 24.) The Vaca Valley Hospital paramedics "performed CPR on St. Jovite for approximately twenty minutes." (Defs.' SUF ¶ 103.) A doctor from Vaca Valley Hospital declared St. Jovite dead at 4:29 p.m. over the telephone. (Id.; Pls.' SUF ¶ 25.) Dr. Noriega did not pronounce St. Jovite dead before the Vaca Valley Hospital paramedics arrived because based on "past experience with paramedics that arrive at the prison, they do not listen to CDCR doctors, and will only follow the directions of their doctor at the [non-prison] hospital." (Defs.' SUF ¶ 102.) However, Dr. Noriega testified at his deposition that he believed St. Jovite was dead and could not be revived. (Dep. of Alfredo Noriega 51:18-24.)

       "After St. Jovite's death, various officers prepared incident reports stating what they saw. Wong requested that several of the reports be changed to reflect the incident time as 3:44 p.m., the time the first responder, Cahoon, called in the medical code." (Defs.' SUF ¶ 105.) Six of the incident reports that Wong requested be changed

1 originally stated that Cahoon called in the medical code at 3:40 p.m.
2 (Decl. of Diana Esquivel in Supp. of Defs.' Mot. for Summ. J., Ex. E, at
3 16, 20, 24, 27, 29, 33.) Another incident report that Wong requested be
4 changed originally stated the call was made at 3:45 p.m. Id. Ex. E, at
5 36.

6 Defendant Tom Carey ("Carey") was the warden at CSP-Solano
7 from July 2001 to March 31, 2006. Id. ¶ 37. Defendant D.K. Sisto
8 ("Sisto") "assumed the position of Warden at [CSP-Solano] on May 9,
9 2006." Id. ¶ 46. In June of 2005, while Carey was serving as warden, the
10 Court in Coleman v. Schwarzenegger, No. 2:90-CV-00520-LKK-JFM (E.D. Cal.
11 2005), issued the following order to the CDCR:

> [I]mplement a policy that establishes clearly and unequivocally a requirement for custody staff to provide immediate life support [to inmates], if trained to do so, until medical staff arrive to initiate or continue life support measures, irrespective of whether the obligation to do so is part of the particular custody staff member's duty statement.

17 Id. ¶ 31. In response, the "CDCR created and adopted an amended CPR
18 policy." Id. ¶ 32. "The CPR policy required that all peace officers who
19 respond[] to a medical emergency [are] mandated to provide immediate
20 life support, if trained to do so, until medical staff arrive[s] to
21 continue life support measures." Id. ¶ 33. Additionally, "[t]he CPR
22 policy mandated responding medical personnel to assume primary
23 responsibility in the provision of medical attention and life-saving
24 efforts upon their arrival." Id. ¶ 35. The CPR policy also states that
25 "combined efforts of both custody and medical personnel are expected.
26 Both custody and medical personnel are responsible to continue life
27 saving efforts in unison as long as necessary." (Pls.' Resp. to Defs.'
28 SUF ¶ 35.) "Carey understood, and trained the custodial staff at [CSP-

1  Solano] with the understanding that, the . . . CPR policy required that
2  officers perform CPR in a medical emergency until medical staff arrived,
3  and when medical [staff] arrived, the officers were to acquiesce to
4  medical staff." (Defs.' SUF ¶ 42.) Carey submitted a declaration to the
5  Coleman Court averring that as of January 27, 2006, 99.9 percent of the
6  correctional officers, correctional counselors, lieutenants, and
7  sergeants at CSP-Solano had been trained on the performance of CPR. Id.
8  ¶¶ 38-39.

9  Defendant Alvaro Traquina ("Traquina") is the Chief Medical
10 Officer at CSP-Solano. Id. ¶ 22. As the Chief Medical Officer, "Traquina
11 was responsible for ensuring that medical staff was properly trained and
12 certified in providing medical care, including providing life saving
13 measures such as [CPR], as required by law and medical standards." Id.
14 ¶ 29. "Traquina also made sure that medical staff met all requirements
15 for licensure and credentialing, including that they received continuing
16 education and training and that their licenses were active." Id.

### III. Discussion

St. Jovite's Estate alleges that prison officials acted with deliberate indifference to a substantial health or safety risk to St. Jovite, in violation of St. Jovite's Eighth Amendment right to be free from cruel and unusual punishment. To prove an Eighth Amendment violation, St. Jovite's Estate must "objectively show that [St. Jovite] was deprived of something sufficiently serious, and make a subjective showing that the deprivation occurred with deliberate indifference to [St. Jovite's] health or safety." Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010) (internal quotation marks omitted).

> The second step, showing deliberate indifference, involves a two part inquiry. First, the [Estate Plaintiff] must show that the prison officials were aware of a substantial risk of serious harm to [St.

11

>Jovite's] health or safety. This part of [the] inquiry may be satisfied if the [Estate Plaintiff] shows that the risk posed by the deprivation is obvious. Second, the [Estate Plaintiff] must show that the prison officials had no reasonable justification for the deprivation, in spite of that risk.

Id. (internal citations and quotation marks omitted).

The individual Plaintiffs allege in their Fourteenth Amendment claim that prison officials violated their substantive due process right of familial association with St. Jovite. "[O]nly official conduct that 'shocks the conscience' is cognizable as a due process violation." Porter v. Osborn, 546 F.3d 1131, 1137 (9th Cir. 2008) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998)). "[T]he shocks the conscience standard is met by showing that [a prison official] acted with deliberate indifference or . . . a more demanding showing that [the prison official] acted with a purpose to harm [the inmate] for reasons unrelated to legitimate [prison administrative] objectives." Id.; see also Kosakoff v. City of San Diego, No. 08-CV-1819-IEG (NLS), 2010 WL 1759455, at *10 (S.D. Cal. Apr. 20, 2010) (stating a Fourteenth Amendment claim is based on "a spectrum between a 'deliberate indifference' standard and a 'purpose to harm' standard") (citing Porter v. Osborn, 546 F.3d at 1137).

**A.   Removal of Building 8 Floor Officers**

Plaintiffs allege the removal of floor officers from Building 8 to attend a meeting called by Defendant Nuehring constituted deliberate indifference in violation of the Eighth and Fourteenth Amendments, because St. Jovite "required direct supervision to protect [his] physical safety since the inmate population included violent persons, suicidal persons, [and] persons taking psychotropic medications with various serious side effects." (Fifth Am. Compl. ¶ 106.) Plaintiffs

12

1 further allege that, as a result of removing the floor officers, "St.
2 Jovite suffered serious cruel and unusual punishment and death," and the
3 individual Plaintiffs "were deprived of their constitutional rights to
4 familial relationship" with St. Jovite. Id. ¶ 112. Plaintiffs argue
5 Defendants Nuehring, Sisto, Wong, Orrick, and Martinez were responsible
6 for the removal of floor officers from Building 8 on the day of St.
7 Jovite's death. Nuehring, Sisto, Wong, Orrick, and Martinez argue there
8 is no evidence showing they knew the removal of the Building 8 floor
9 officers would create a substantial risk to St. Jovite's health or
10 safety.

11 Even assuming that each of these Defendants was responsible
12 for the removal decision, the record is devoid of evidence from which it
13 can be reasonably inferred that any Defendant knew the removal would
14 subject St. Jovite to a substantial health or safety risk. Cf. Gibson v.
15 Cnty. of Washoe, Nevada, 290 F.3d 1175, 1197 (9th Cir. 2002) (finding
16 that "deputies who . . . remained unaware of [a pretrial detainee's]
17 mental condition cannot be held liable for having been 'deliberately
18 indifferent' to it"). Nor is there evidence in the record from which it
19 can be reasonably inferred that the removal created an "obvious" risk of
20 harm to St. Jovite. Thomas v. Ponder, 611 F.3d at 1150. Therefore, it
21 has not been shown that a triable issue of material fact exists on the
22 Eighth or Fourteenth Amendment claims involving the removal issues.

23 **B. Failure to Administer CPR or Other Life-saving Measures**

24 Plaintiffs allege in their complaint that Defendants Cahoon,
25 Alcaraz, Wade, Holliday, Chua, Wong, Orrick, Martinez, Hak, Hicks, and
26 Noriega violated the Eighth and Fourteenth Amendments when "these
27 defendants [knowing] that [St. Jovite] faced a substantial risk of
28 serious harm, to wit, death, when they found him unconscious on the

floor[,] . . . disregarded that risk by failing to apply CPR and to initiate life saving measures." (Fifth Am. Compl. ¶ 108.) Plaintiffs also allege that Wong, Orrick, and Martinez violated the Eighth and Fourteenth Amendments by failing to order custodial officers to perform CPR on St. Jovite. Id. ¶ 128.

It is uncontroverted that Cahoon and Holliday were the first officers to arrive at St. Jovite's cell. (Pls.' Response to Defs.' SUF ¶ 60.) Upon arrival, Cahoon believed that St. Jovite and his cell mate Harden were or had been fighting, so Cahoon ordered Harden "to back away and asked what happened." (Defs.' SUF ¶ 62.) Once Cahoon assessed the situation, she signaled for the cell to be opened. Id. ¶ 63, 65-66. After the cell door was open, Cahoon ordered Harden to step out of the cell; Wade then escorted Harden to the floor level. Id. ¶ 72. Hak, a medically-trained prison official, arrived at St. Jovite's cell as soon as the cell area was secured. Id. ¶ 73.

Since Hak, and subsequently other medically-trained prison officials, were with St. Jovite from the time the cell area was secured until paramedics from the Vaca Valley Hospital arrived, Cahoon, Alcaraz, Wade, Holliday, Chua, Wong, Orrick, and Martinez--the non-medical prison officials--deferred to the judgment of the medical staff members concerning whether CPR or other life-saving measures should be used on St. Jovite. "Under the circumstances, [Cahoon, Alcaraz, Wade, Holliday, Chua, Wong, Orrick, and Martinez] reasonably relied on the expertise of the medical professionals and . . . did not act with deliberate indifference toward [St. Jovite]" by failing to administer CPR or other life-saving measures. Johnson v. Doughty, 433 F.3d 1001, 1011 (7th Cir. 2006). Nor did Wong, Orrick, and Martinez act with deliberate indifference when failing to order the non-medical custodial officers to

14

1 administer CPR on St. Jovite since a medically-trained prison official
2 was present and assessing whether such a measure should be used.

3 Plaintiffs argue that Wong's request for certain officers to
4 change the time on their incident reports as to when the medical code
5 call was made evinces that "the supervisory staff engaged in a concerted
6 effort to cover up the fact that Cahoon and Holliday failed to [endeavor
7 to save St. Jovite's life]." (Pls.' Response to Defs.' Mot. for Summ. J.
8 14:27-28.) It is undisputed that Wong requested certain officers change
9 the time in their incident reports as to when the medical code call was
10 made by 1-4 minutes. However, these changes do not support Plaintiffs'
11 cover-up argument, since the evidence shows that Cahoon and Holliday
12 took immediate action to secure St. Jovite's cell area, and Cahoon and
13 Holliday did not administer CPR or other life-saving measures on St.
14 Jovite because Hak arrived at the cell as soon as the cell area was
15 secured. (Defs.' SUF ¶ 73.)

16 The record is silent on why Hak failed to perform CPR or other
17 life-saving measures on St. Jovite. Thus, the issue is whether Hak's
18 failure to perform CPR or other life-saving measures on St. Jovite
19 before stepping aside when nurse Hill arrived constitutes deliberate
20 indifference to saving St. Jovite's life. The uncontroverted facts show
21 that "Hak checked St. Jovite's carotid pulse by moving down the sheet a
22 bit; there was no pulse." Id. ¶ 76. Hak saw St. Jovite "was purplish in
23 color, and his feet were cold." Id. "Blood had settled where [Hak]
24 believed [St. Jovite] had gone into rigor mortis based on her training
25 and experience." Id. Hak then applied an automated external
26 defibrillator ("AED"), "which showed a flat line." Id. ¶ 77. Hak
27 "stepped aside" when Hill, a CSP-Solano nurse, arrived at St. Jovite's
28 cell "and let Hill make his own assessment because he was a registered

1  nurse." Id. ¶¶ 77, 78. These uncontroverted facts do not show that Hak
2  was "aware" that St. Jovite could be revived before she ceded assessment
3  of St. Jovite's condition to nurse Hill. Thomas v. Ponder, 611 F.3d at
4  1150. Therefore, even if Hak "should have been aware [that St. Jovite
5  could be revived], but was not . . . [Hak] has not violated the Eighth
6  [or Fourteenth] Amendment[s]." Gibson v. Cnty. of Washoe, 290 F.3d at
7  1188.

8  The record is also silent about what Hill did. But there is no
9  showing that Hill's conduct has any bearing on the actions of Hicks and
10 Dr. Noriega–-the other medically-trained prison Defendants, and the
11 uncontroverted facts show that Hicks and Dr. Noreiga did not perform CPR
12 or other life-saving measures on St. Jovite because each of these
13 Defendants believed St. Jovite was already dead and could not be
14 revived. (Defs.' SUF ¶ 96; Dep. of Alfredo Noriega 51:18-24.)

15 Plaintiffs argue that Dr. Noriega did not think St. Jovite
16 could not be revived since Dr. Noriega did not pronounce St. Jovite
17 dead, and it is evident that the Vaca Valley Hospital paramedics
18 concluded St. Jovite could be revived since those paramedics performed
19 CPR on St. Jovite after Dr. Noriega assessed St. Jovite. (Pls. Response
20 to Defs. SUF ¶ 100.) However, "[t]here is no indication in the record
21 that Dr. [Noriega] could have performed any procedure to revive [St.
22 Jovite]. Consequently, there is no legal significance to the fact that
23 individuals other than Dr. [Noriega] attempted to revive [St. Jovite]."
24 Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004). Therefore,
25 notwithstanding the unsuccessful efforts of the Vaca Valley Hospital
26 paramedics to revive St. Jovite, Dr. Noriega's "response to the
27 emergency was not deliberately indifferent. The [Plaintiffs'] conclusory
28

16

1 assertion to the contrary is insufficient to raise an issue of material
2 fact." Id.
3    There is no evidence indicating that either Hicks or Dr.
4 Noriega incorrectly assessed St. Jovite's condition when concluding his
5 death was irreversible. Nor does the record contain evidence indicating
6 that either of these Defendants was consciously aware of the possibility
7 that St. Jovite's life could have been revived. Therefore, Plaintiffs
8 have failed to show deliberate indifference on the part of Hicks and
9 Dr. Noriega in light of the observations they made about St. Jovite, and
10 each of these Defendant's motion is granted.
11    **C.   CPR Training**
12    Plaintiffs also allege that Defendant Traquina--the Chief
13 Medical Officer at CSP-Solano, and Defendant Carey--the former warden at
14 CSP-Solano--acted with deliberate indifference in their supervisory
15 capacities by failing to properly train medical and custodial staff on
16 the performance of CPR or other life-saving measures. (Fifth Am. Compl.
17 ¶¶ 138, 141.) However, there is no evidence showing that either of these
18 supervisory officials deficiently trained the staff on CPR or on other
19 life-saving measures, or that CPR was required to be performed on St.
20 Jovite before a medically trained prison official assessed whether St.
21 Jovite's body showed life signs. Further, "a supervisor . . . can[not]
22 be held liable under § 1983 where no . . . constitutional violation has
23 occurred." Jackson v. City of Bremerton, 268 F.3d 646, 653 (9th Cir.
24 2001). Here, the issue has not been shown to be whether a Defendant was
25 properly trained in the performance of CPR or other life-saving
26 measures; rather, the issue is whether a medically trained Defendant
27 acted with deliberate indifference when assessing St. Jovite to
28 determine whether he manifested signs of life or whether he was dead and

not revivable. Since it has not been shown that Defendants were deliberately indifferent to St. Jovite's health when this assessment was conducted, Traquina and Carey cannot be liable in their supervisory capacities for Plaintiffs' claims.

### IV. Conclusion

For the stated reasons, each Plaintiff's motion for summary judgment is denied, and each Defendant's summary judgment motion is granted. Therefore, judgment shall be entered in favor of Defendants in accordance with this Order and the Orders filed on January 28, 2010 and April 19, 2010.

Dated: February 17, 2011

_____
GARLAND E. BURRELL, JR.
United States District Judge